IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON  DIVISION

| | | |
|---|---|---|
| Paul B. Goist, | ) | CIVIL ACTION NO. 9:14-4036-RMG-BM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Charles Samuels, Rear Admiral Newton R. | ) | |
| Kendig, Harrell Watts, South East Regional | ) | |
| Director, John and Jane Does, Warden Cruz, | ) | |
| Victor Loranth, M.D. and William Rigney, M.D., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This action was originally filed by the Plaintiff, pro se, in the United States District

Court for the Eastern District of North Carolina, asserting claims under the Federal Tort Claims Act

(FTCA).  At the time Plaintiff filed this action, he was a federal inmate housed at the Federal

Correctional Institution in Butner, North Carolina.  By Order filed October 16, 2014, this case was

transferred to the District of South Carolina because Plaintiff was making claims with respect to

medical care he received while housed at a Federal Correctional Institution in South Carolina, and

a tort claim against the United States can be prosecuted "only in the judicial district where the

Plaintiff resides or where the act or omission complained of occurred".  See Court Docket No. 13.

Following transfer of the case to this District, Plaintiff filed an amended Complaint

wherein he also asserted constitutional claims pursuant to  Bivens v. Six Unknown Named Agents

of the Federal Bureau of Narcotics, 403 U.S. 388 (1971).[1]  In his amended Complaint, Plaintiff seeks

---

[1]In Bivens, the Supreme Court established a direct cause of action under the Constitution of
(continued...)



1

monetary damages, as well as injunctive relief. On January 22, 2015, Plaintiff filed a change of address notice advising that he had been transferred to FCI Williamsburg in Salters, South Carolina. See Court Docket No. 52.

Thereafter, Plaintiff withdrew his FTCA claims, and the Defendant United States was dismissed as a party Defendant in the case. See Court Docket No. 71. The remaining Defendants filed a motion for summary judgment as to Plaintiff's remaining Bivens claims on March 23, 2015. Plaintiff filed a memorandum in opposition on April 2, 2015, which he then followed with several supplemental filings. See Court Docket Nos. 82, 84, 87, 88, 93, 122, 139. This matter is now before the Court for disposition.[2]

### Background and Evidence[3]

Plaintiff alleges in his Verified Amended Complaint[4] that on or about March 14, 2013

---

[1](...continued)
the United States against federal officials for the violation of federal constitutional rights. A Bivens claim is analogous to a claim under 42 U.S.C. § 1983. However, federal officials cannot be sued under 42 U.S.C. § 1983 because they do not act under color of *state* law. See Harlow v. Fitzgerald, 457 U.S. 800, 814-820 (1982). Nonetheless, Harlow and progeny indicate that case law involving § 1983 claims is applicable in Bivens actions and *vice versa*. Farmer v. Brennan, 511 U.S. 825 (1994). See also Mitchell v. Forsyth, 472 U.S. 511, 530 (1985); Turner v. Dammon, 848 F.2d 440, 443-444 (4th Cir. 1988); Osabutey v. Welch, 857 F.2d 220, 221-223 (4th Cir. 1988); and Tarantino v. Baker, 825 F.2d 772, 773-775 (4th Cir. 1987), cert. denied, North Carolina v. Tarantino, 489 U.S. 1010 (1989).

[2]This case was automatically referred to the undersigned United States Magistrate Judge for all pretrial proceedings pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(d) and (e), D.S.C. The Defendants have filed a motion for summary judgment. As this is a dispositive motion, this Report and Recommendation is entered for review by the Court.

[3]As Plaintiff has dismissed his claims asserted under the FTCA, the only claims set forth and discussed hereinabove are those claims relating to Plaintiff's claims under Bivens.

[4]In this Circuit, verified complaints by pro se litigants are to be considered as affidavits and
(continued...)



he went to FCI Williamsburg Health Care Services complaining about severe pain in his left leg and knee, which had been ongoing for about six to eight months. Plaintiff alleges that he was seen and evaluated by the Defendant Rigney (a Physicians's Assistant), who instructed him to purchase some anti-inflammatory medications from the commissary and also recommended that x-rays be performed. Plaintiff alleges that x-rays were thereafter taken on March 20, 2013, which were negative.

Plaintiff alleged that April 12, 2013, he slipped and fell on a wet floor while "horse playing" with another inmate, twisting his left knee. Plaintiff alleges he reported this injury to "Correctional Officer Perry", who advised him that, since it was Friday, it would be best to wait until Monday before going to medical. Plaintiff alleges that he "agreed with Officer Perry". Plaintiff further alleges that it was not until April 17, 2013 that he was finally seen by the Defendants Rigney and Dr. Loranth in medical. Plaintiff alleges that although he was initially told to "return again to sick call", that after he objected Rigney agreed to look at his left knee. Plaintiff alleges that, after noting "increased swelling and instability", Rigney aspirated his left knee, removing one hundred milliliters or more of "serosanguineous" fluid. Plaintiff alleges that this fluid was "disposed of", and was never tested. Another x-ray was also performed at that same time, which was again negative, and Rigney ordered that an MRI be performed.

Plaintiff alleges that the MRI was performed on May 29, 2013, which revealed that

---

[4](...continued)
may, standing alone, defeat a motion for summary judgment when the factual allegations contained therein are based on personal knowledge. <u>Williams v. Griffin</u>, 952 F.2d 820, 823 (4th Cir. 1991).



he had "sustained a serious medical injury".[5]  Plaintiff alleges that he was thereafter seen by Rigney on July 23, 2013 for a review of his MRI results and to plan a course of treatment.  Plaintiff alleges that Rigney prescribed him Ibuprofen for pain management and advised that he was to be seen and examined by "Dr. Woodbury", an orthopedic surgeon.  Plaintiff was thereafter seen by Dr. Woodbury on August 22, 2013, who recommended a left knee arthroscopy with partial lateral menisectomy versus repair and possible partial medial meniscetomy and ACL reconstructive surgery.  Plaintiff was then seen again by Rigney on September 13, 2013, where he received instructions as to the surgery procedure.  Utilization Review Committee (URC) approval for the surgery was requested, and  Plaintiff alleges that the Defendants Rigney, Dr. Loranth, and "John/Jane Doe Utilization Review/litigation (also known as URC) Committee" approved his surgery September 25, 2013.  See also, Exhibit [URC Approval] (part of Plaintiff's Attachment A to his original Complaint).  Plaintiff alleges that he was advised his surgery would be scheduled, and that Dr. Woodbury would perform the surgery.

However, Plaintiff alleges that he was thereafter transferred on May 22, 2014 to the Federal Medical Center in Butner, North Carolina for his medical treatment and surgery.  Plaintiff alleges that the Butner medical staff ("Dr. Hall and others on [Plaintiff's] medical team") had to order new x-rays and MRI testing because more than six months had elapsed from the first MRI testing, and that he was thereafter provided his needed surgery on July 7, 2014, which was performed

---

[5]The findings from Plaintiff's MRI showed that he had "contusions" in the medial and lateral tibial condyle and lateral femoral condyle, a "bucket handle" tear in the body and posterior horn of the lateral meniscus with "flipped fragment" posterior to anterior horn and intercondylar notch, chronic full thickness tear of the anterior cruciate ligament, a sprain in the mid portion of posterior cruciate ligament, moderate joint effusion, and a small Baker's cyst.  See Exhibit [Final Radiology Report from May 29, 2013] (part of Attachment A to Plaintiff's original Complaint).



by Dr. Hall in a "cordial, professional and prompt manner".  Nonetheless, Plaintiff alleges that he

suffered permanent damage to his left knee as a direct and proximate cause of the Defendants' "delay

and denial [of] surgery".  Plaintiff also alleges that (at the time of the filing of the Amended

Complaint) he was undergoing physical therapy under the care of Dr. "Nobles/physical therapist",

and has "been instructed that he should never run again or do jumping jacks, or any other high

impact activity".

Although Plaintiff originally alleged several causes of action in his amended

Complaint, as previously noted, all of his tort claims have now been dismissed.  With respect to his

remaining claims, Plaintiff alleges that the Defendants Samuels, Kendig, Watts, "John/Jane Doe",

Cruz, Dr. Loranth and Rigney were all deliberately indifferent to his serious medical needs, thereby

causing "the unwanton infliction of physical and suffering".

Specifically, Plaintiff alleges that Cruz (the Warden at FCI Williamsburg) is liable

because he allegedly improperly handled his grievance concerning his health issues.[6]  Plaintiff also

alleges that the Defendant Cruz violated his rights by "overriding" the URC's final authority by

setting aside the URC's planned course of approved treatment.  Therefore, Cruz is liable for

"delaying, denying and being deliberately indifferent to [Plaintiff's] serious medical needs".  Plaintiff

also alleges that the Defendants "John/Jane Does" acted arbitrarily in denying his administrative

appeal by upholding Cruz's decision, thereby proximately causing a deliberate indifference to

Plaintiff's serious medical needs and prolonging Plaintiff's physical pain and suffering.  Plaintiff

alleges that the Defendant Watts violated his constitutional rights for the same reason; i.e., the

---

[6]Although citing to several allegedly improper decisions made with respect to his grievances, Plaintiff alleges he properly exhausted his prison administrative remedies with respect to this claim prior to filing this lawsuit.  See Amended Complaint, ¶ ¶ 23-32.



"capricious answer and denial of [Plaintiff's] administrative appeal . . . .". See generally, Plaintiff's Amended Complaint, (Count I).

Plaintiff also alleges that the Defendant Samuels, Kendig, Cruz, Watts, and John/Jane Does were deliberately indifferent to his serious medical needs by failing to provide him with pain management and emergent medical care and treatment for his severe left knee injury. Plaintiff alleges that, although the Defendants had developed a treatment plan for him, they then abandoned the approved course of medical treatment, and that it was not until he filed for an administrative remedy and was transferred to a medical facility (Butner) that he obtained treatment. See Amended Complaint, (Count IV).

Plaintiff further alleges that all of these Defendants, plus the Defendants Dr. Loranth and Rigney, have violated the rights of inmates in general by refusing to provide "appropriate medical care and treatment to inmates who have severe chronic alterior cruciate ligament and meniscus tears". See Amended Complaint, (Count V).[7]

Plaintiff also alleges that these Defendants, despite being aware of medically appropriate treatment for his severe medical condition and injury, refused and continued to refuse for over a year to provide [Plaintiff] with treatment for his severe medical condition, pain and

---

[7]Although, in his Count V, Plaintiff appears to be asserting a claim on behalf of inmates generally, as a pro se litigant Plaintiff cannot pursue a claim on behalf of other inmates. See Hummer v. Dalton, 657 F.2d 621, 625-626 (4th Cir. 1981)[a prisoner cannot act as a "knight-errant" for others]; Oxendine v. Williams, 509 F.2d 1405, 1407 & n. * (4th Cir. 1975)[a pro se prisoner unassisted by counsel cannot be an advocate for others in a class action]; Inmates v. Owens, 561 F.2d 560, 562-563 (4th Cir. 1977)[one pro se inmate does not have standing to sue on behalf of another inmate]. See also Myers v. Loudon Co. Pub. Sch., 418 F.3d 395, 401 (4th Cir. 2005)[finding that a pro se person's right to litigate for oneself does not create a similar right to litigate on behalf of others].



suffering.  See, Plaintiff's Amended Complaint, (Count VI).

Plaintiff seeks monetary damages, as well as certain declaratory and/or injunctive relief.  See generally, Plaintiff's Amended Complaint, (also referencing Exhibits attached to his original Complaint).

In support of summary judgment in the case, the Defendant Maureen Cruz has submitted an affidavit wherein she attests that during the relevant time period she was the Warden at FCI Williamsburg.  Cruz attests that Plaintiff was housed at FCI Williamsburg from October 26, 2012 to May 22, 2014, when he was transferred to the Federal Medical Center in Butner, North Carolina.  Cruz attests that on January 23, 2014, Plaintiff submitted a Request for Administrative Remedies in which he complained that he should have immediately received emergency surgery after medical staff aspirated bloody fluid from his knee.  Cruz attests that Plaintiff stated in that Request for Administrative Remedy that he was still waiting for his surgery, and requested $10,000.00 per day in damages since the date on which the URC had approved his surgery.

Cruz attests that she responded to Plaintiff's Request for Administrative Remedy on January 29, 2014, in which she outlined the course of treatment for Plaintiff's knee up to that point, noted that the orthopedic specialist had recommended left knee arthroscopic surgery and complete ACL reconstruction, that the orthopedic specialist had also explained to Plaintiff the risk and benefits of the procedure, that she had stated in her response that the risk associated with the procedure outweighed its benefits, and that in the interim Plaintiff had been scheduled for further evaluation with a community orthopedic specialist.  Cruz further attests that, although Plaintiff is implying in this lawsuit that she interfered with the URC's authorization of his surgery by finding that the risk associated with the recommended ACL procedure outweighed its benefits, that the wording of that

7



sentence in her response was in fact a typographical error, and should have correctly read that the benefits of the proposed ACL surgery outweighed the risk. Cruz attests that the fact that this was a typo is demonstrated by the next sentence in her response noting that Plaintiff had been scheduled for further evaluation, meaning that his surgery was still pending.

Cruz attests that she relies on medical staff to determine the necessary medical care an inmate should receive, and that she was not involved in the decision making process in deciding what treatment was medically necessary. Cruz further attests that she was not a member of the URC, did not have the authority to override it's determinations, and did not attempt to do so, with her only involvement in this matter being responding to Plaintiff's Request for Administrative Remedy. See generally, Cruz Affidavit.

The Defendant Dr. Victor Loranth has submitted an affidavit wherein he attests that he is the Clinical Director at FCI Williamsburg. Dr. Loranth attests that Plaintiff arrived at FCI Williamsburg with a history of hepatis C, kidney pain, hyperlipidemia, and depressive delusional order, but with no mention of any knee issues. Further, during Plaintiff's initial health screening on October 26, 2012 (when he first arrived at FCI Williamsburg), Plaintiff was instructed on how to obtain medical and mental health care, and at that time did not complain of any knee issues. Dr. Loranth attests that he also saw the Plaintiff for a chronic care clinic appointment on October 30, 2012, at which time Plaintiff again did not mention any issues with his knee.

Dr. Loranth attests that on March 12, 2013, Plaintiff submitted an Inmate Request to Staff Form complaining of "chronic leg and knee pain". Plaintiff was thereafter seen at Health Services on March 14, 2013, at which time he complained of severe left knee pain at night, lessened in the daytime but still present. Plaintiff had no known injury, redness, or heat in his left knee, and



an examination revealed no grinding and that the knee was stable to walk on , although there was

some mild swelling.  Dr. Loranth attests that Plaintiff complained that he had been having problems

with his knee "going on for six to eight months", and that he was advised to purchase over the

counter pain medication from the commissary and return to Health Services in one week after x-rays

had been taken.  Dr. Loranth attests that x-rays were then taken on March 20, 2013, which were

negative and unremarkable.  See also, Defendants' Exhibit (Court Docket No. 74-13, p. 14).

Dr. Loranth attests that the Defendant Rigney, a Certified Physician's Assistant,

evaluated Plaintiff for his knee issue on April 17, 2013, with Plaintiff advising Rigney at that time

that he had twisted his knee about one week earlier.  Plaintiff further advised that after this injury

he had experienced swelling with increased pain when weight bearing, that his knee had "buckled",

and that it felt like his "kneecap came out of place".  Observation revealed joint effusion and limited

range of motion, and P. A. Rigney aspirated 100 milliliters of bloody aspirant from Plaintiff's left

knee.  Dr. Loranth attests that Rigney ordered x-rays, which were grossly unremarkable, as well as

an MRI.  Pending results of Plaintiff's MRI, Plaintiff was provided a cane to assist with ambulation,

was advised to ice and elevate his knee and obtain over the counter pain medication from the

commissary, and return to Health Services in one week or sooner if he had any concerns of if his

condition worsened.  Dr. Loranth attests that, while Plaintiff complains that P. A. Rigney did not

perform several specific tests during this visit, that those tests were not medically necessary or

appropriate.[8]  Dr. Loranth also attests that P. A. Rigney followed the proper procedure in aspirating

---

[8]The tests Plaintiff alleges should have been performed were an Alley's Compression Test,
a Patella Grind Test, a Pivot Shift Test, and a McMurray/Lachman's Test.  However, Dr. Loranth
attests that there is no such thing as an Alley's Compression Test, that a Patella Grind Test was not
(continued...)



Plaintiff's knee, that the fluid obtained was not checked for sedimentation rate or rheumatoid factors (as Plaintiff alleges it should have been) because those are blood tests obtained from a patient's arm, that Rigney's dictations notes do not mention any infectious or benign serosanguineous fluid (as Plaintiff alleges in his Complaint), and that if the fluid had appeared to be infectious, it would have been sent to a lab for evaluation. Dr. Loranth also attests that, although Plaintiff alleges in his Complaint that "instability" was noted during the evaluation, the record from this visit specifically states that there was "no gross instability" in the left knee. See also, Defendants' Exhibit (Court Docket No. 74-13, pp. 15-17).

Dr. Loranth attests that on April 25, 2013, the URC (of which he is a member) approved the scheduling of Plaintiff's MRI, that the MRI was taken on May 29, 2013, and the results were delivered to FCI Williamsburg on June 19, 2013. Dr. Loranth attests that he reviewed the results on June 28, 2013, following which he reviewed the results with the Plaintiff during a Chronic Care Clinic appointment on July 2, 2013. Dr. Loranth attests that, at that time, Plaintiff reported that he was experiencing pain at a level of only 3 on a 10 point scale, and that based on the MRI results, the plan was to schedule Plaintiff for an orthopedic consultation, which was approved by the URC the very next day. Dr. Loranth attests that P. A. Rigney also ordered new x-rays on August 8, 2013 so that they would be available for Plaintiff's upcoming orthopedic consultation, that those images were provided on August 20, 2013, and were again unremarkable and negative for fracture.

---

[8](...continued)
indicated as it tests for chronic degenerative arthritis and acute injury, and that the two other tests mentioned by the Plaintiff were not performed since those tests would involve flexing the knee to ninety degrees, which was not reasonable due to Plaintiff's pain complaints and high degree of swelling and range of motion being limited.



Plaintiff was then seen by the orthopedist on August 22, 2013. Plaintiff advised the orthopedist that he had been involved in an altercation with an obese inmate who had "went against" the lateral aspect of Plaintiff's left leg. Plaintiff also reported "a history in the past of the left knee locking one time while running several years ago", as well as a "remote motorcycle accident in which he may have injured his left knee". The orthopedist confirmed that Plaintiff's most recent x-rays were "unremarkable", opined that Plaintiff had sustained an ACL tear, a displaced bucket handle tear, and a possible medial meniscual tear, and recommended left knee arthroscopy with partial lateral meniscectomy versus repair as well as ACL reconstruction and a possible partial medial meniscectomy. Dr. Loranth attests that he reviewed the orthopedist consultation notes on August 23, 2013. In light of these recommendations, on September 13, 2013 P. A. Rigney submitted a request that Plaintiff undergo left knee arthroscopy with partial lateral meniscectomy and ACL reconstruction, and the URC approved the surgery referral on September 25, 2013.

Dr. Loranth attests that on October 29, 2013, Plaintiff's medical duty status was updated to reflect that he have a lower bunk pass, that he be restricted from playing all sports, and that the recreation restrictions be lifted once his surgery was completed and he was cleared to return to normal activity. On November 13, 2013, Plaintiff's prescription was renewed for Ibuprofen, to be taken three times daily. Dr. Loranth attests that on March 21, 2014, he signed a referral request that Plaintiff be transferred to Butner based on BOP Program Statement 6031.04 (40) [Patient Care], which states that "[i]nmates requiring extended, formal physical therapy" should be referred to Medical Referral Centers such as Butner. Dr. Loranth attests that on May 8, 2014 he renewed Plaintiff's prescription for Ibuprofen for one hundred eighty days, and that on May 22, 2014 Plaintiff was transferred to Butner, where he underwent the surgery that had been recommended by FCI

11



Williamsburg medical personnel.

Dr. Loranth attests that, although Plaintiff alleges in his amended Complaint that the six month wait between URC approval and his transfer to Butner was "so extreme as to exceed all bounds of human decency", that he never complained of pain at sick call during this time period, nor did he submit any Inmate Request to Staff Forms. Dr. Loranth attests that the aspiration of Plaintiff's fluid on April 17, 2013 was consistent with BOP policy, that overall the treatment of Plaintiff's knee injury was consistent with prevailing community standards, that the medical treatments administered to the Plaintiff either met or surpassed the relevant community standards of care, and that he and his staff provided Plaintiff with evidence based proven effective medical care. Dr. Loranth further attests that, as to the timing of Plaintiff's surgery, he did not delay or deny Plaintiff surgery, that medical transfers are processed by BOP staff at regional and central offices, and that ultimately an inmate is transferred only when bed space becomes available at the appropriate facility. Dr. Loranth attests that, as in any clinical scenario where patient demand outpaces available medical resources, there is a protocol for prioritizing care for certain conditions before others, and that while Plaintiff did have to wait for his medical transfer to be effected, in the interim he assured that Plaintiff's condition was continuously monitored and that he was provided ongoing treatment to manage his condition, which was not a medical emergency. Further, while Plaintiff's transfer was pending, he received a conservative course of treatment that addressed pain management and prevented further injury, with (as noted) Plaintiff never complaining of pain at sick call or submitting Request to Staff Forms during the time between the URC approval and the day on which he was transferred to Butner. Dr. Loranth attests that, in his medical opinion, the absence of pain complaints underscores the non-emergent nature of Plaintiff's knee condition. See generally, Loranth Affidavit.

12



The Defendant William Rigney has provided an affidavit wherein he attests that during the relevant time period he was a Physician's Assistant at FCI Williamsburg. P. A. Rigney attests that a review of Plaintiff's BOP records shows that when Plaintiff arrived at FCI Williamsburg he made no mention of any knee issues, and that it was not until March 12, 2013 that Plaintiff submitted an Inmate Request to Staff Form complaining of chronic leg and knee pain which he said had been going on for six to eight months. P. A. Rigney attests that Plaintiff was seen at Health Services on March 14, 2013, at which time there was no known injury, redness, or heat in his left knee, and that although there was some mild swelling, Plaintiff's knee had no grinding and was stable to walk on . Plaintiff was counseled on a course of treatment and x-rays were ordered, which were negative and unremarkable. P. A. Rigney also notes that, although Plaintiff alleges that he [Rigney] evaluated him during the encounter on March 14, 2013, that Plaintiff's medical records actually reflect that another BOP staff member performed that evaluation. P. A. Rigney attests that the first time he ever evaluated Plaintiff for his knee issue was April 17, 2013, at which time Plaintiff told him that he had twisted his knee about one week earlier, experiencing increased pain and swelling immediately afterward. P. A. Rigney attests that he observed joint effusion and limited range of motion, and that under sterile conditions he aspirated 100 milliliters of bloody aspirate from Plaintiff's left knee. P. A. Rigney also ordered x-rays (which were grossly unremarkable) and an MRI, and Plaintiff was provided a cane and counseled on a treatment plan pending the results of his MRI. Plaintiff was told to return to Health Services in one week, or sooner if he had any concerns or his condition worsened. Rigney also completed a Medical Duty Status Form that same day restricting Plaintiff to a lower bunk. See, Defendants' Exhibit (Court Docket No. 74-13, p. 19).



P. A. Rigney attests that he did not perform the tests Plaintiff references in his Complaint for the same reasons already attested to by Dr. Loranth in his affidavit. P. A. Rigney also attests that he properly performed the aspiration of Plaintiff's left knee, that the fluid obtained suggested a tear of the ACL, meniscus or patellar retinaculae, and that he never stated that this aspirate was infectious or was benign serosanguineous fluid. P. A. Rigney attests that if the fluid had appeared to be infectious, it would have been sent to a lab for further testing. Further, although Plaintiff alleges in his Complaint that he [Rigney] had noted "instability" during his evaluation, in fact he [Rigney] had found that there was "no gross instability" in Plaintiff's left knee. As for Plaintiff's allegation that he was not given any pain prescription. P. A. Rigney attests that Plaintiff was told to obtain over the counter pain medicine from the commissary, which appeared to have sufficiently managed Plaintiff's pain since Plaintiff himself reported a pain scale of only 3 out of 10 during his Chronic Care Clinic encounter on July 2, 2013.

P. A. Rigney attests that he ordered new x-rays on August 8, 2013 for Plaintiff's upcoming orthopedic consultation, which were received on August 20, 2013 and which were again unremarkable and negative for fracture. Plaintiff was thereafter seen by the orthopedist on August 22, 2013, who recommended the left knee surgery previously discussed. P. A. Rigney attests that although Plaintiff alleges he saw him on September 13, 2013, that Plaintiff's medical records actually show that this was an administrative note where he [Rigney] documented the orthopedic consultation previously described, and that he did not have a conversation with the Plaintiff on that date. See also, Defendants' Exhibit (Court Docket No. 74-13, p. 37). P. A. Rigney thereafter updated Plaintiff's medical duty status on October 29, 2013, and renewed Plaintiff's Ibuprofen prescription on November 13, 2013. See also, Defendants' Exhibit (Court Docket No. 74-13, pp.



41-42).

P. A. Rigney attests that, in his opinion, the treatment of Plaintiff's knee injury was consistent with prevailing community standards, consistent with BOP policy, and met or even surpassed the relevant community standards of care.  P. A. Rigney further attests that he provided Plaintiff with evidence based proven effective medical care, and that as to the timing of Plaintiff's surgery, he played no role in the scheduling of Plaintiff's operation or his transfer to Butner.  See generally, Rigney Affidavit.

The Defendant Charles Samuels has submitted an affidavit wherein he attests that he is the Director of the Federal Bureau of Prisons (BOP), that he his responsible for the general supervisory management and oversight of the agency, that his business office is located at the BOP Central Office in Washington, DC, and that he does not have primary responsibility for inmates house in Federal Correctional Facilities.  See generally, Samuels Affidavit.

The Defendant Newton Kendig has submitted an affidavit wherein he attests that he is the Medical Director for the Health Services Division of the BOP, that he is responsible for the general supervisory management and oversight of the BOP's medical operations, that his business office is located at the BOP's Central Office in Washington, DC, that specific functions and tasks pertaining to individual institutions are delegated to the respective medical staff and administrators, and that he does not have primary responsibility for inmates housed in Federal Correctional Facilities.  See generally, Kendig Affidavit.

The Defendant Harrell Watts has submitted an affidavit wherein he attests that during the relevant time period he held the position of National Inmate Appeals Administrator.  Watts attests that as the Appeals Administrator he supervised the Administrative Remedies Program for



the BOP's Office of General Counsel to ensure that responses to inmate complaints were in compliance with BOP policy, that his only involvement in this matter was to review and sign the Central Office responses to Plaintiff's administrative remedy appeals, that he relies on medical staff to determine the necessary medical care an inmate should receive and was not involved in the decision making process in deciding what treatment was medically necessary for the Plaintiff, and that his business office was located at the BOP's Central Office in Washington, DC. See generally, Watts Affidavit.

The Defendants have also submitted an affidavit from H. J. Marberry, who attests that he is the Regional Director of the South East Region for the BOP. Marberry attests that he understands that he has been named as a Defendant in this case (per the naming of John/Jane Doe Defendant South East Regional Director), and that his business office is located at the South East Regional Office in Atlanta, Georgia. Mayberry attests that, as Regional Director, he is responsible for the general supervisory management and oversight of the facilities within the South East Region, but that specific functions and tasks pertaining to individual institutions are delegated to their respective wardens and staffs: he does not have primary responsibility for inmates house in Federal Correctional Facilities. Mayberry attests that a review of the BOP records reveals that Plaintiff filed a Request for Administrative Remedy (No. 764011-F1) on January 3, 2014 complaining that he should have immediately received emergency surgery after medical staff aspirated bloody fluid from his knee, that Plaintiff's request was denied on January 29, 2014 wherein the Warden outlined Plaintiff's medical treatment to date, that on February 8, 2014 Plaintiff appealed to the South East Region complaining that the Warden had determined that the risk associated with the procedure outweighed its benefit and had denied his surgery, and that the region's response was for



informational purposes, as Plaintiff was reminded that he continued to receive medical care consistent with BOP policy. Mayberry attests that while his title appears at the bottom of all Administrative Remedy responses from the South East Regional Office, he does not review or sign all of these responses, which are in most instances signed by designees to whom this authority has been delegated, and that his only involvement in this matter was the appearance of his title at the bottom of the Regional Response letter. See generally, Mayberry Affidavit.

In addition to these documents, the Defendants have also attached copies of Plaintiff's administrative remedy documents, copies of his FTC administrative remedies documents, copies of his medical file (consisting of 151 pages of medical documentation), some psychiatric history medical documents, a copy of BOP Program Statement 6031.04, a copy of Plaintiff's Inmate Work Detail History, a copy of Plaintiff's transfer memorandum to Butner, a copy of Plaintiff's overall inmate transfer history, and a copy of Plaintiff's sentence computation data.

As attachments to his response in opposition to the Defendants' motion, Plaintiff has submitted several affidavits, including one from himself. Plaintiff attests in his affidavit that the Defendants "delayed my surgery for economic reasons", and also repeats his claim that the Defendant Cruz overrode the determination by the URC to approve his surgery, noting her statement in the response to his Administrative Remedy that the "risk associated with the procedure outweigh its benefits". See also, Defendants' Exhibit (Court Docket No. 74-10, p. 5). Plaintiff also disputes Cruz's characterization of her statement in the Administrative Remedy response that the fact that he had been scheduled for further evaluation underscored that his surgery was still pending, arguing that this statement infers only that he was going to have another evaluation performed, when he did not need another evaluation - he needed surgery. Plaintiff also argues that Dr. Loranth was deliberately



indifferent to his ongoing serious medical conditions and needs and did "consciously disregard a known risk and failed to follow generally accepted medical standards for treating [his] serious knee injury . . . .", which Plaintiff claims required "immediate surgery". Plaintiff also again complains that he was not provided any pain medication during the aspiration procedure on his left knee.

Plaintiff claims that the length of time he had to wait before his surgery resulted in "permanent damage to my left knee which prohibits me from running, jumping, climbing and other high-impact activities and recreational sports". Plaintiff also again states that the various tests cited in his Complaint (and discussed by Loranth in his affidavit) should have been performed during his visit to Medical Services on April 17, 2013, that Loranth failed to prescribe him proper medications, and that he was deliberately denied pain management. Plaintiff complains in his Affidavit that his medical duty status was not updated until October 29, 2013, such that prior to that time he had to climb to an upper bunk to sleep,[9] and also complains that the prescription for Ibuprofen he received (to be taken three times a day) was improper because he has a liver condition as a result of being diagnosed with Hepatis C. Plaintiff complains that even though Dr. Woodbury could have performed his surgery, and has in fact performed surgery on other inmates, he had to wait to be transferred to Butner before his surgery was performed. Plaintiff states that if his treatment for his knee had been consistent with prevailing community standards, he would have had immediate surgery performed, and that in addition to Dr. Loranth, the Defendant P. A. Rigney also "failed to exercise ordinary care" in performing his duties. Finally, Plaintiff contends that the actions of the

---

[9]This claim is belied by the documented evidence that Rigney issued a Medical Duty Status Form on April 17, 2013 (the very first day he was seen by Medical Services) restricting him to a lower bunk. See Defendants' Exhibit (Court Docket No. 74-13, p. 19).

18



Defendants violated various BOP policies, or in the alternative that the policies themselves violated his constitutional rights.  See generally, Plaintiff's Affidavit.

Plaintiff has also submitted an affidavit from a fellow inmate, James King, who attests that he is an inmate a FCI Williamsburg and arrived at the Institution "on the exact day [Plaintiff] was injured".  King attests that on April 17, 2013 Plaintiff was "horse playing with another inmate who weighed about three hundred fifty pounds, during which Plaintiff was injured".  King attests that Plaintiff could not walk without assistance and his knee was extremely swollen.  King attests that he recommended Plaintiff go to medical, but that when Plaintiff spoke to Correctional Officer Perry (second shift officer), he was told that he should wait until Monday since it was Friday afternoon and everyone had gone home.  King attests that Plaintiff agreed with Perry "because walking to medical would only make his condition worse", so he went to his cell to elevate his leg.  King attests that he was in the cell with Plaintiff, and that Plaintiff was in extreme pain and had to use the assistance of other inmates to keep from falling until a cane was provided.  King attests that Plaintiff complained at the "main line" (apparently a shorter distance between going to sick call) about his pain on "several occasions", and was told to purchase pain medication from the commissary and that "he would be fine".  See generally, King Affidavit.

Plaintiff has also submitted an affidavit from another inmate, David Pawloski, who attests that he arrived at FCI Williamsburg on or about January 2014.  Pawloski attests that shortly before his arrival at the prison, he had undergone lumbar spine surgery, and that he had also undergone cervical spine surgery in 1990.  Pawloski attests that at his initial medical screening, the nurse told him he would be seen by a BOP doctor in less than one month and renewed his medications.  Pawloski also attests that he was interviewed by Dr. Loranth, but complains that

19



Loranth "never examined [me] and he refused to look at my incisions to determine if I was healing properly". Pawloski attests that he was examined by a neurologist several months later, who recommended he receive proper pain management and physical therapy, but that since that time Dr. Loranth has "drastically reduced and changed my pain medications" and has denied him emergency treatment on "several occasions". Pawloski also complains that Dr. Loranth has "utterly refused to update my medical file and place specific restrictions in my file". Pawloski states that Dr. Loranth "practices in a bizarre and unprofessional manner and does not practice with prevailing professional norms under state law principles, federal law or BOP Policy . . . .". See generally, Pawloski Affidavit.

Plaintiff subsequently submitted an "Amended Declaration" from James King (Court Docket No. 87-1), in which King changes the date of Plaintiff's knee injury to April 12, 2013. King further states that he was not present when the injury occurred, but that subsequently Plaintiff could not walk without assistance and his knee was extremely swollen. The remainder of the affidavit appears to be essentially unchanged from his previous affidavit. See generally, King's Supplemental Declaration.

Plaintiff also submitted as part of this supplemental response an affidavit from inmate William Edward Kelley, who attests that he is an inmate at FCI Williamsburg and resided in the same unit with the Plaintiff when he injured his knee as well as "at the current time". Kelley attests that following his injury, Plaintiff "appeared to be in extreme pain" and that it "looked like his entire kneecap came out of place or something to that effect". Kelley states that, "though I am not a doctor and do not know what exactly was wrong with his leg, it was serious". Kelley attests that he observed Plaintiff "in severe pain for at least eight months or longer", and although he was

20



eventually provided a cane, this "wasn't much assistance considering [Plaintiff] having to bear weight on a knee that was unstable . . . .". See generally, Kelley Affidavit.

Plaintiff also as part of his supplemental response provided an affidavit from Darius Lamont Galloway, another inmate FCI Williamsburg. Galloway also attests that Plaintiff was in "severe pain" and could not walk very well "because his leg would come out of place . . . .". Galloway further attests that he was "at medical" on one occasion when Plaintiff was "refused treatment" and told to purchase medication from the commissary. Galloway attests that it was "very difficult for [Plaintiff] to walk to the medical department" because of his pain, that he observed Plaintiff in "severe pain" for at least eight months, and that although he was eventually provided a cane, this "wasn't much assistance considering him having to bear weight on a knee that was unstable . . . .". See generally, Galloway Affidavit.

In yet another filing on May 21, 2015 (Court Docket No. 122), Plaintiff submitted a copy of a letter from the South Carolina Department of Labor, Licensing and Regulation stating that Dr. Loranth was not a licensed M.D. in South Carolina.[10]

---

[10]Plaintiff has filed several additional motions relating to Dr. Loranth not being licenced to practice medicine in South Carolina, and objecting to evidence from this Defendant. However, defense counsel represents as an officer of the court that Dr. Loranth, an employee of the United States Department of Justice, Federal Bureau of Prisons, holds current licenses from both Virginia and New York, and South Carolina law does not prohibit the practice of any legally qualified licensee of another state who is employed by the United States Government or any department, bureau, division, or agency of the United States Government, while in the discharge of official duties. See S.C. Code Ann. § 40-37-30(A)(6). **Nevertheless, out of an abundance of caution, defense counsel should file, as part of any response to objections which may be submitted to this Report and Recommendation, copies of Dr. Loranth's licenses from Virginia and New York so that the District Judge will have these documents to review as part of his consideration of this matter.**



### Discussion

Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Rule 56, Fed.R.Civ.P. The moving party has the burden of proving that judgment on the pleadings is appropriate. Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991). Once the moving party makes this showing, however, the opposing party must respond to the motion with specific facts showing there is a genuine issue for trial. Baber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992). Further, while the Federal Court is charged with liberally construing a complaint filed by a pro se litigant to allow the development of a potentially meritorious case, see Cruz v. Beto, 405 U.S. 319 (1972); Haines v. Kerner, 404 U.S. 519 (1972), the requirement of liberal construction does not mean that the Court can ignore a clear failure in the pleadings to allege facts which set forth a Federal claim, nor can the Court assume the existence of a genuine issue of material fact where none exists. Weller v. Dep't of Social Services, 901 F.2d 387 (4th Cir. 1990). Here, after careful review and consideration of the arguments and evidence presented, the undersigned concludes that the Defendants are entitled to summary judgment in this case.

As federal employees, each of the named individual Defendants is subject to suit for damages in their individual capacities in a Bivens action. However, in order to proceed with a Bivens claim for denial of medical care, Plaintiff must present evidence sufficient to create a genuine issue of fact as to whether any named Defendant was deliberately indifferent to his serious medical needs. Estelle v. Gamble, 429 U.S. 97, 106 (1976); Farmer v. Brennen, 511 U.S. 825, 837 (1994); Sosebee v. Murphy, 797 F.2d 179 (4th Cir. 1986); Wester v. Jones, 554 F.2d 1285 (4th Cir. 1977);

22



Russell v. Sheffer, 528 F.2d 318 (4th Cir. 1975); Belcher v. Oliver, 898 F.2d 32 (4th Cir. 1990). Plaintiff has failed to submit any such evidence.

### I.

First, there is no evidence before this Court that the Defendants Samuels, Kendig, Watts, Marberry, or Cruz were involved in any decisions made with respect to Plaintiff's medical care and treatment. These Defendants cannot be held liable in this case simply because they held supervisory positions with the Bureau of Prisons or even at the prison where Plaintiff was housed, or were somehow involved in Plaintiff's BOP grievance appeals process. See Vinnedge v. Gibbs, 550 F.2d 926, 927-929 & nn. 1-2 (4th Cir. 1977). Rather, in order to establish liability for any of these Defendants, the evidence must be sufficient to create a genuine issue of fact as to whether any of these Defendants was personally involved in deciding on and providing Plaintiff's medical care, or that the allegedly improper care was the result of an official policy or custom for which any of these Defendants was responsible. See generally, Dahl v. Weber, 580 F.3d 730, 733 (8th Cir. 2009)[Prison warden may be liable under § 1983 only if the warden is personally involved in, or directly responsible for, the prisoner's plight]; Slakan v. Porter, 737 F.2d 368, 375-376 (4th Cir. 1984), cert. denied, Reed v. Slakan, 470 U.S. 1035 (1985)[Supervisory official may be liable for actions of subordinates only where subordinates' allegedly unconstitutional conduct was the result of an official policy or custom for which the supervisory official was responsible]; Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994), cert. denied, 115 S.Ct. 67 (1994); Fisher v. Washington Metro Area Transit Authority, 690 F.2d 1133, 1142-1143 (4th Cir. 1982), abrogated on other grounds, 500 U.S. 44 (1991) (citing Hall v. Tawney, 621 F.2d 607 (4th Cir. 1980)).

Here, even though the facts (construed most favorably to the Plaintiff) show that these



Defendants may have been aware that Plaintiff was dissatisfied with his medical care, there is no evidence whatsoever to show that any of these Defendants did anything other than rely on the medical personnel at the prison to provide Plaintiff's medical care, or that any medical care Plaintiff received was improper because of a custom or policy of any of these Defendants or that these Defendants had personal knowledge that any medical care being provided was not proper. See Shakka v. Smith, 71 F.3d 162, 167 (4th Cir. 1995) [officials entitled to rely on judgment of medical personnel]; Miltier v. Beorn, 896 F.2d 848, 854 (4th Cir. 1990) [officials entitled to rely on expertise of medical personnel]; see also Levy v. State of Ill. Dept. of Corrections, No. 96-4705, 1997 WL 112833 (N.D.Ill. March 11, 1997) ["A defendant acts with deliberate indifference only if he or she 'knows of and disregards' an excessive risk to inmate health or safety.'"], quoting Farmer v. Brennan, 511 U.S. at 837.  While Plaintiff alleges that Cruz "overroad" the URC's approval of his surgery, Cruz attests that she had no authority to overrule the URC's decision, and indeed it is readily apparent that Plaintiff received his recommended surgery[11] - the only issue being whether Plaintiff's constitutional rights were violated because his surgery was not performed immediately.  Cruz's only involvement in this matter was her review of Plaintiff's grievance appeal wherein Plaintiff complained about not receiving his surgery immediately.  There is no evidence whatsoever in the record that she had any role in deciding what level or kind of medical care Plaintiff should receive,

---

[11]The documentary evidence confirms Cruz's affidavit testimony that she did not overrule the URC's decision.  While Plaintiff cites to the language in Cruz's denial of his administrative remedy that the "risks associated with the [surgery] outweigh its benefits" (which Cruz attests is a typo), the record of Plaintiff's appeal of Cruz's decision noted that he had been recommended for knee surgery, that he had been approved for a secondary (and, significantly, "non-emergent") consultation with the surgeon, that Plaintiff would be notified of his appointment logistics, and that Plaintiff had his surgery, which even Plaintiff concedes was successful. See also, Defendants' Exhibits (Court Docket No. 74-10, pp. 5, 8 10-11).



or was involved in the scheduling of his surgery.

The same is true for Watts and Marberry, who are involved in the grievance appeals process with the BOP. Both of these two Defendants attest that they rely on medical staff to determine the necessary medical care an inmate should receive and were not involved in the decision making process in deciding what treatment was medically necessary for the Plaintiff. Even if Plaintiff's claim that one or more of these Defendants mishandled or improperly handled his grievance is assumed to be true for purposes of summary judgment, that is not a claim cognizable in this Court in a <u>Bivens</u> action, as there is no constitutional right to access to a prison grievance procedure. See <u>Adams v. Rice</u>, 40 F.3d 72, 74 (4th Cir. 1994); <u>Buckley v. Barlow</u>, 997 F.2d 494, 495 (8th Cir. 1993) [existence of a prison grievance procedure does not confer any substantive right upon inmates]; <u>Flick v. Alba</u>, 932 F.2d 728, 729 (8th Cir. 1991); <u>Brown v. Dodson</u>, 863 F.Supp. 284 (W.D.Va. 1994) [inmates do not have a constitutionally protected right to a grievance procedure]; <u>Azeez v. DeRobertis</u>, 568 F.Supp. 8, 10 (N.D.Ill. 1982) [even where a state elects to provide a grievance mechanism, violations of its procedures do not deprive prisoners of federal constitutional rights]; <u>Burnside v. Moser</u>, 138 Fed.Appx. 414, 415-416 (3d Cir. June 30, 2005). Therefore, failure to follow grievance procedures does not give rise to a <u>Bivens</u> claim. <u>Spencer v. Moore</u>, 638 F.Supp. 315, 316 (E.D.Mo. 1986) [holding that an inmate grievance procedure is not constitutionally required]; <u>cf. McGuire v. Forr</u>, No. 94-6884, 1996 WL 131130, at *1 (E.D.Pa. March 21, 1996), <u>aff'd</u>, 101 F.3d 691 (3d Cir. 1996) [creation of a grievance system by a state does not create any federal constitutional rights, as prisoners are not constitutionally entitled to a grievance procedure].

Further, even if the Court were to assume for purposes of summary judgment that one or more of the Defendants violated BOP polices in their handling of Plaintiff's complaints or



grievances, the violation of such policies also does not constitute a violation of Plaintiff's constitutional rights, and is therefore not assertable in a <u>Bivens</u> action. <u>See</u> <u>Keeler v. Pea</u>, 782 F.Supp. 42, 44 C.D.S.C. 1992); <u>Singleton v. Administrative Food Service Brown</u>, No. 12-2985, 2014 WL 3687348 at * 2, 5 (D.S.C. July 24, 2014) [Fining in <u>Bivens</u> action that a failure to follow BOP policies, standing alone, does not amount to a constitutional violation]; <u>Morris v. Allen</u>, 12-146, 2013 WL 3422893 at * * 1, 4 (E.D.Ark. July 8, 2013) [same]; <u>cf</u>. <u>Scott v. Hamidullah</u>, C/A No. 3:05-3027-CMC-JRM, 2007 WL 904803 *5 n. 6 (D.S.C. March 21, 2007) (citing <u>Riccio v. County of Fairfax, Virginia</u>, 907 F.2d 1459, 1469 (4th Cir. 1990)); <u>Johnson v. S.C. Dep't of Corrections</u>, No. 06-2062, 2007 WL 904826 at *12 (D.S.C. Mar. 21, 2007) ["Plaintiff's allegation that defendants did not follow their own policies or procedures, standing alone, does not amount to a constitutional violation."] (citing <u>Riccio</u>, 907 F.2d at 1469 [if state law grants more procedural rights than the Constitution requires, a state's failure to abide by that law is not a federal due process issue]).[12]

   As for Samuels and Kendig, there is no evidence to show that either of these two Defendants played any role in the events set forth in the Complaint at all. Therefore, the Defendants Samuels, Kendig, Watts, Marberry and Cruz are entitled to dismissal as party Defendants in this case, even if the Court were to determine that otherwise this lawsuit should be allowed to proceed.

## II.

   With respect to the remaining Defendants Loranth and Rigney, while these Defendants did provide medical care to the Plaintiff, Plaintiff has failed to present evidence

---

   [12]While many of these case cites refer to constitutional claims being pursued against state officials pursuant to § 1983, as previously noted, case law involving § 1983 claims is applicable in Bivens actions, and <u>vice</u> <u>versa</u>. <u>See</u> Note 1, <u>supra</u>.



sufficient to create a genuine issue of fact as to whether either of these two Defendants was deliberately indifferent to his serious medical needs. Estelle, 429 U. S. at 106. To the contrary, the evidence before this Court shows that Plaintiff received continuous and ongoing treatment for his medical complaints. Plaintiff was regularly seen [not just for the medical complaints alleged in this lawsuit, but (as documented by his medical records) for various other medical problems as well] by nurses, nurse practitioners, and doctors, he has undergone his recommended knee surgery; and he was regularly provided with tests, profiles, and lab screens to monitor and aid in the treatment of his medical problems. While it is readily apparent in the medical evidence that Plaintiff sustained a knee injury that an orthopedist recommended be corrected by surgery, there is no evidence that this was in any way any kind of emergency or that Plaintiff required emergency surgery for this condition, or that any Defendant has been deliberately indifferent to Plaintiff's condition or to Plaintiff's complaints. Levy, No. 96-4705, 1997 WL 112833 ["A defendant acts with deliberate indifference only if he or she 'knows of and disregards' an excessive risk to inmate health or safety.'"], quoting Farmer, 511 U.S. at 837; House v. New Castle County, 824 F.Supp. 477, 485 (D.Md. 1993) [Plaintiff's conclusory allegations insufficient to maintain claim]; cf. Martin v. Bowman, Nos. 94-6246, 94-6256, 1995 WL 82444 at * * 1-4 (4th Cir. Feb. 24, 1995) [summary judgment granted where no evidence knee surgery had to be performed immediately].

       In addition to the voluminous medical records provided to the Court showing that Plaintiff was regularly seen by medical personnel for his complaints regarding his knee (as well as for other medical complaints), the Defendants have also provided affidavits from a licensed physician as well as a physicians's assistant attesting to the extent, nature and quality of medical care Plaintiff has received and that Plaintiff has been provided effective and adequate medical care and



treatment within the appropriate standard of care for his complaints. In contrast to this *medical evidence*, Plaintiff has presented no evidence to show that any named Defendant was deliberately indifferent to his medical needs. Rather, Plaintiff has simply offered his own lay opinion (as well as the lay opinions of some fellow inmates) that the medical care and treatment he received was somehow improper or inadequate. While Plaintiff alleges in his Complaint and in the documents he has filed in opposition to the Defendants' summary judgment motion that his knee condition was an "emergency" that required immediate surgery, and that his failure to have immediate surgery and the length of time he had to wait for his surgery resulted in permanent damage to his left knee, Plaintiff has provided absolutely no *medical evidence* to substantiate this claim, to show that Rigney was in any way deliberately indifferent to his serious medical needs by failing to provide him with the various tests Plaintiff claims should have been performed on April 17, 2013 (one of which Dr. Loranth attests does not even exist), or that the Defendants in any other way were deliberately indifferent to his serious medical needs. Cf. King v. Flinn & Dreffein Eng'g Co., No. 09-410, 2012 WL 3133677, at * 10 (W.D.Va. July 30, 2012)[Finding no genuine issue of material fact where only evidence was "uncorroborated and self-serving testimony"], citing Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002); see also Nat'l Enters., Inc. v. Barnes, 201 F.3d 331, 335 (4th Cir. 2000)[Holding that a self-serving affidavit was insufficient to survive summary judgment].

Plaintiff's complaint is quite simply that the medical personnel referenced in his Complaint did not provide him with the type of medical care *he desired*. However, it is clear in the evidence provided to this Court that the medical professionals involved in Plaintiff's case evaluated Plaintiff's condition and rendered a judgment as to the type of care and treatment warranted based on their professional experience and judgment, and Plaintiff's mere lay disagreement with the



opinions or diagnoses of these medical professionals, without any contrary *medical* evidence to show that any medical professional violated the requisite standard of care for his complaints, is simply not sufficient to maintain a deliberate indifference lawsuit.  See Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985)[Disagreements between an inmate and a physician over the inmate's proper medical care do not state a Bivens claim absent exceptional circumstances]; Scheckells v. Goord, 423 F.Supp. 2d 342, 348 (S.D.N.Y. 2006) (citing O'Connor v. Pierson, 426 F.3d 187, 202 (2d Cir. 2005) ["Lay people are not qualified to determine...medical fitness, whether physical or mental; that is what independent medical experts are for."]); see also Hill v. Dekalb Regional Youth Detention Center, 40 F.3d 1176, 1188-1189 (11th Cir. 1994)["An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed"], overruled in part by Hope v. Pelzer, 536 U.S. 730, 739 n. 9 (2002).

　　　　While Plaintiff may not agree with the extent and nature of the medical care he received, he cannot simply allege that he did not receive constitutionally adequate medical care or attention, otherwise provide no supporting evidence, and expect to survive summary judgment, particularly when the Defendants have submitted medical documents, expert opinions, and other evidence showing that Plaintiff was regularly seen and evaluated by medical personnel for his complaints, and which refute Plaintiff's claim that medical personnel were deliberately indifferent to his serious medical needs.  Green v. Senkowski, 100 Fed.Appx. 45 (2d Cir. 2004) (unpublished opinion) [finding that plaintiff's self-diagnosis without any medical evidence insufficient to defeat summary judgment on deliberate indifference claim]; Morgan v. Church's Fried Chicken, 829 F.2d 10, 12 (6th Cir. 1987) ["Even though pro se litigants are held to less stringent pleading standards



than attorneys the court is not required to 'accept as true legal conclusions or unwarranted factual inferences.'"]; <u>Levy</u>, No. 96-4705, 1997 WL 112833 ["A defendant acts with deliberate indifference only if he or she 'knows of and disregards' an excessive risk to inmate health or safety.'"].

Therefore, the Defendants Loranth and Rigney are entitled to summary judgment on Plaintiff's deliberate indifference claim.

### Conclusion

Based on the foregoing, it is recommended that the Defendants' motion for summary judgment be **granted**, and that this case be **dismissed**.

The parties are referred to the Notice Page attached hereto.

_____
Bristow Marchant
United States Magistrate Judge

June 29, 2015
Charleston, South Carolina

30



**Notice of Right to File Objections to Report and Recommendation**


The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
Post Office Box 835
Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

